**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**



FILED
CLERK, U.S. DISTRICT COURT

NOV 7. 2017

CENTRAL DISTRICT OF CALIFORNIA
BY: ____BH____ DEPUTY

Socheat Chy,

                      Plaintiff,

           v.

Lam Sin Yam, et al.,

                   Defendants.

17-cv-04325 VAP (AGRx)

**Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (Doc. No. 45)**

On September 19, 2017 Defendants Lam Sin Yam, Tiffany Ngo, Ngo Asset Management, LLC, Tiffany Ngo in her capacity as Trustee of the Tiffany Ngo Living Trust Utd., Cruise Thru dairy d/b/a/ Cruise Thru Dairy, Valero Mart Inc. d/b/a/ Valero Mart/Arco Market Inc., and Tiffany Ngo d/b/a Speedy Wash (collectively "Defendants") filed their Motion to Dismiss Plaintiff Socheat Chy ("Plaintiff") Fourth, Seventeenth, Twenty-Second, and Twenty-Ninth Claims for Relief for Failure to State a Claim (F.R.C.P. 12(b)(6)) ("Motion.")  (Doc. No. 45.)  On October 16, 2017 Plaintiff filed her Opposition to Defendants' Motion.  (Doc. No. 46.)  Defendants filed their Reply in Support of their Motion on October 23, 2017.  (Doc. No. 50.)

After considering the papers filed in support of, and in opposition to, the Motion, the Court rules as follows.

United States District Court
Central District of California

# I. BACKGROUND

Plaintiff alleges the following facts in her Second Amended Complaint (Doc. No. 44) ("SAC").

## A. PARTIES

Plaintiff Socheat Chy ("Plaintiff") was born in Cambodia, and was trafficked to the United States by Defendants as a part of a scheme to force Plaintiff to provide labor without adequate compensation or benefits for Defendants' benefit. (SAC at ¶¶ 1, 6.) Plaintiff has alleged that each of the Defendants (as described below) have participated in this scheme in various ways. (SAC at ¶¶1, 6, 20.)

Defendant Lam Sin Yam ("Sin"), resides in Palmdale, California and is alleged to have masterminded the scheme to traffic Plaintiff into the United States to provide forced labor for Defendants. (SAC at ¶7.)

Defendant Naing Lam Yam ("Yam") is Sin's brother and resides in Long Beach, California. (SAC at ¶8.)

Defendant Molica Ratha Keo ("Keo") is, or was at one point, Yam's girlfriend, and resides in Long Beach, California. (SAC at ¶¶14, 41.)

Defendant Nivodeth Khiev ("Khiev"), is Keo's daughter and owns a residence in Long Beach, California. (SAC at ¶15.)

Defendant Tiffany Ngo ("Ngo") is Sin's daughter and resides in Palmdale, California. Ngo owns or owned various businesses where Plaintiff was required to

work.  (SAC at ¶9.)  Ngo owns or owned Defendants Cruise Thru Dairy, d/b/a Cruise Thru Dairy; Valero Mart Inc., d/b/a Valero Mart/ Arco Market Inc.; and Tiffany Ngo, d/b/a Speedy Wash and is also the agent of an asset management company, Defendant Ngo Asset Management, LLC, which owns or owned a shopping center where Plaintiff was required to work.  (SAC at ¶9.)  Ngo is also a trustee of The Tiffany Ngo Living Trust UTD, which owns substantially all of Ngo's, Lim's, and Ngo Asset Management, LLC's real properties.  (SAC at ¶11.)

Defendant Ray Lim ("Lim") is Sin's son and Ngo's brother.  (SAC at ¶12.)  He owns or owned the Defendant Valero Mart Inc., d/b/a Valero Mart/ Arco Market Inc. business.  (SAC at ¶12.)

Defendant Cindy Kanya Chan ("Chan") was born in Cambodia and resides in Long Beach, California.  (SAC at ¶13.)  She is alleged to have participated in the scheme by co-sponsoring Plaintiff's immigration process.  (SAC at ¶13.)

## B.  Plaintiff Trafficked to the United States From Cambodia

Plaintiff was born in Banan, a small village in northwest Cambodia, in 1990.  (SAC at ¶ 21.)  She grew up poor, helping her parents care for her two younger sisters.  (SAC at ¶ 21.)  In or around July or August 2009, when Plaintiff was a teenager, a relative of Plaintiff's moved to the United States to work for Sin.  (SAC at ¶ 22.)  Later, that relative's family in Cambodia appeared to prosper.  (SAC at ¶ 23.)  This sparked Plaintiff's interest in moving to the United States so that she could similarly help her family.  (SAC at ¶ 23.)  Shortly after Plaintiff's interest was

piqued, Sin's brother, Yam, came to visit Plaintiff.  (SAC at ¶ 24.)  Yam told Plaintiff about the possibility that she could work in a shop in the United States and that she could make more money than she was earning in Cambodia.  (SAC at ¶ 24.)  Plaintiff told Defendant Yam she wanted to come to the United States.  (SAC at ¶ 24.)

At the end of 2009 or early 2010, Sin called Plaintiff and instructed her to stop working and to begin taking English classes.  (SAC at ¶ 25.)  Sin also told Plaintiff's family members that if Plaintiff did not obey Sin, Plaintiff would not be able to go to the United States.  (SAC at ¶ 25.)  Plaintiff obeyed in part because she was afraid that if she did not, her younger sister, who Plaintiff believed was not old enough to protect herself, would be forced to go to the United States in her place.  (SAC at ¶ 34, 40.)  During the first few months of 2010, Sin exercised power over Plaintiff in order to isolate her from her community in Cambodia.  This included making arrangements for Plaintiff to become engaged to a stranger and then canceling the engagement after Plaintiff and the man had been seen together as a couple in public.  (SAC at ¶ 26-33.)  This exposed Plaintiff to ridicule and shame, and harmed her prospects of getting married if she were to stay in Cambodia.  (SAC at ¶ 33, 35.)

In July 2010, Sin instructed Plaintiff to marry her brother Yam (twenty-eight years older than Plaintiff) and do whatever Yam told her to do if she wanted to come to the United States.  (SAC at ¶¶ 36-38.)  Yam forced Plaintiff to take pictures with him in compromising positions and to pretend to be his wife in public.  (SAC at ¶ 39.)  Yam's girlfriend, Keo, helped fill out Plaintiff's visa application forms and directed Plaintiff on what to say during her interviews with U.S. immigration officials.  (SAC at ¶ 41, 43.)  Chan provided false attestations to U.S. immigration

United States District Court
Central District of California

4

officials certifying that she was Plaintiff's joint sponsor and could provide Plaintiff with financial support.  (SAC at ¶ 42.)

In or around May or June 2013, Yam came to Cambodia to bring Plaintiff to the United States.  (SAC at ¶ 44)  Yam traveled with Plaintiff, and Sin picked Plaintiff up at the airport on June 11, 2013.  (SAC at ¶ 44)  Sin took Plaintiff to Ngo's residence in Palmdale, California.  (SAC at ¶ 44)

## C. PLAINTIFF FORCED TO WORK FOR DEFENDANTS AND SUB- JECTED TO ABUSE AND THREATS.

On Plaintiff's first full day in the United States, Sin demanded that Plaintiff give Sin her passport and promise not to run away or steal from Sin.  (SAC at ¶ 46.)  Sin threatened great harm would come to Plaintiff if she broke these promises.  (SAC at ¶ 46.)  Later that week, Yam came to Ngo's house.  (SAC at ¶ 47.)   Sin told Plaintiff that she had already paid Yam $20,000 for Plaintiff's travel to the United States, and then counted out an additional $20,000 in cash and handed it to Yam in front of Plaintiff.  (SAC at ¶ 47.)   Plaintiff understood from this exchange that she owed Sin $40,000.  (SAC at ¶ 47.)

For the next five months, Sin and her children Lim and Ngo, required Plaintiff to work seven days per week, approximately 17 hours a day, at their various businesses and houses.  Plaintiff performed tasks such as tending to the cash registers, stocking shelves, mopping floors, and cleaning in Defendants' gas stations, laundromat, and shopping center.  (SAC at ¶ 48-49.)  Plaintiff was also required to clean and mop Ngo's house and tend to Ngo's backyard and garden.  (SAC at ¶ 49.)

Plaintiff was not paid for this labor, and was denied proper meal and rest periods and other benefits as required under California law.  (SAC at ¶ 50-54.).

During this time, Defendants forced Plaintiff to sleep in a stocking room at the Valero Gas Station.  (SAC at ¶ 55.)  Sin did not allow Plaintiff the use of any bedding apart from a thin blanket and a lawn chair because Sin wanted to avoid raising suspicion if the gas station was visited by an inspector.  (SAC at ¶ 55.)  Defendants arranged to have a relative of Plaintiff's stay with Plaintiff at the gas station and gave this relative the sole control of the entry and access points of the gas station.  (SAC at ¶ 57.)

Sin and Ngo physically and verbally abused Plaintiff during this time.  Sin would pull her hair, curse at her, and scream at Plaintiff if she asked a question or made a mistake.  (SAC at ¶ 58.)  On one occasion, Sin punched Plaintiff in the back of her head.  (SAC at ¶ 58.)  Another time Sin hit Plaintiff repeatedly in the eye with a bottle full of water.  (SAC at ¶ 60.)  Another time Sin stabbed Plaintiff in the face.  (SAC at ¶ 65.)  Sin also filed her nails to a point and scratched Plaintiff and poked Plaintiff's eyes and ears.  (SAC at ¶ 59.)  Ngo similarly hit Plaintiff, screamed at her, called her names, told customers that she was mentally unstable, and said slanderous things about Plaintiff's parents.  (SAC at ¶ 61.)  This abuse caused Plaintiff physical and mental harm.  (SAC at ¶ 63-64.)

In late October 2013, Plaintiff sought the help of Yam, who had previously offered to help her escape.  (SAC at ¶ 62, 66.)  Instead of helping Plaintiff to escape, however, Yam, Keo, and Khiev forced Plaintiff to remain hidden in their house and to perform domestic labor for them.  (SAC at ¶¶ 66-67.)  In return for approximately

five months of performing domestic labor six to twelve hours per day, seven days per week, Plaintiff was paid $500.  (SAC at ¶ 67.)  In April 2014, Yam returned Plaintiff to the Arco gas station in the middle of the night, and made Plaintiff promise not to tell Sin where she had been.  (SAC at ¶ 71.)

Upon Plaintiff's return, Sin told Plaintiff that because she ran away, Plaintiff's mother had been involved in a near-fatal motorbike accident.  (SAC ¶ 72)  Sin told Plaintiff that if she ran away again, her family would be cursed with poverty and misery and that great harm would come to Plaintiff.  (SAC at ¶ 72.)  A month or two later, Sin forced Plaintiff to sign a contract stating that Plaintiff owed Sin $40,000.  (SAC at ¶ 73.)

For seventeen months after Yam returned her to Sin's control, Plaintiff was again forced to perform labor for Defendants for about 14-15 hours per day, seven days per week.  (SAC at ¶ 74.)  During this time, Sin and Ngo continued to abuse Plaintiff verbally and physically as before.  (SAC at ¶ 77.)

## D. Plaintiff Attempts Suicide

In August 2014, Plaintiff attempted suicide by ingesting a bottle of Motrin and ten tablets of Advil.  (SAC at ¶78.)  Although Plaintiff got very sick, Sin, Ngo, and Lim agreed not to take Plaintiff to the hospital, forced Plaintiff to continue working at the gas station, and berated her.  (SAC at ¶ 78-79.)  Following her suicide attempt, Plaintiff "felt crazy all the time" and like "she did not have control over her body." (SAC at ¶ 80.)  After surviving this attempt, Plaintiff decided she wanted to live so that she could see her mother again, and resolved to escape.  (SAC at ¶ 81.)

### E.  Plaintiff Rescued by Law Enforcement

In or around August 2015, Plaintiff decided to contact a police officer who frequented one of Defendants' stores.  (SAC at ¶ 82.)  Because of her difficulty speaking English and her fear of being discovered by Defendants, Plaintiff was afraid to speak to him in person.  (SAC at ¶ 82.)  Over the course of two weeks, Plaintiff asked customers and coworkers how to say and spell the words she needed for the note she planned to give to the police officer.  (SAC at ¶ 82.)  To avoid detection by Defendants, she never asked any one person for more than one or two words.  (SAC at ¶ 82.)  Once she had constructed the note, Plaintiff had a customer pass it to the police officer the next time he visited the store.  (SAC at ¶ 83.)  The police officer left Plaintiff a note with his contact information.  Plaintiff discreetly secured a telephone and told the officer about her situation.  (SAC at ¶ 83.)  Plaintiff was rescued by law enforcement on September 28, 2015, and law enforcement later raided Defendants' properties.  (SAC at ¶ 83.)

After she was rescued, Plaintiff was diagnosed with post-traumatic stress disorder, and now lives in a shelter for trafficking survivors.  (SAC at ¶84.)

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief.  Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47 (1957) (holding that the Federal Rules require a plaintiff to provide "'a short and plain statement of the claim' that will give the defendant fair notice of

United States District Court
Central District of California

what the plaintiff's claim is and the grounds upon which it rests" (quoting Fed. R. Civ. P. 8(a)(2))); Bell Atl. Corp. v Twombly, 550 U.S. 544, 555 (2007).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).  "The court need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court."  Schwarz v. United States, 234 F.3d 428, 435 (9th Cir. 2000).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F. 3d 1202, 1216 (9th Cir. 2011).

Although the scope of review is limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990), and "take judicial notice of matters of public record outside the pleadings," Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988).

### III.   DISCUSSION

Defendants move to dismiss Plaintiff's Fourth, Seventeenth, Twenty-Second, and Twenty-Ninth claims for relief for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  (See Doc. No. 45 at 2.)  The Court addresses these four claims, in turn, below.

### A. PLAINTIFF'S CLAIM FOR UNLAWFUL CONDUCT REGARDING DOCUMENTS – CLAIM 4

Plaintiff's Fourth Claim for Relief is brought pursuant to provisions 18 U.S.C. § 1592 and § 1595(a) of the Trafficking Victim's Protection Act ("TVPA") against all Defendants.  (SAC, ¶¶116-122.)  Section 1592 of the TVPA makes it unlawful to

remove, confiscate or possess a passport or other immigration document in connection with a violation of certain other TVPA sections.  18 U.S.C. § 1592(a).  Section 1595 sets forth the civil remedies of the TVPA, and allows victims to recover damages and reasonable attorneys' fees from a "perpetrator . . . or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter . . . ."  18 U.S.C. § 1595.

Defendants appear to concede that the SAC includes sufficient facts to allege a violation of §1592 against Sin, and the SAC alleges that Sin physically confiscated Plaintiff's passport in order to restrict Plaintiff's movements.  (Doc. No. 46 at 11; SAC, ¶45 ("On [Plaintiff's] first full day in the United States, Sin began manipulating [Plaintiff] with threats and coercion.  At Defendant's Ngo's residence, Sin demanded that [Plaintiff] give Sin her passport.  [Plaintiff] did not understand why Sin needed her passport, but she complied because she was scared.").)

Defendants (except for Sin) move for dismissal of this claim.  (Doc. No. 45-1 at 11-12.).  Defendants argue that the SAC only implicates Sin as having "had any involvement in possession of Plaintiff's passport" and therefore § 1592 does not apply to the other defendants.   (Doc. No. 45-1 at 12.)  Defendants need not be directly involved in the physical confiscation and possession of Plaintiff's passport, however, given the statutory language expanding the scope of potential defendants to those who "knowingly benefitted" from the violation.[1]

---

[1] Defendants' citation to United States v. Nnaji, 447 F. App'x 558, 561 (5th Cir. 2011) is unavailing.  In Nnaji, the Court found that testimony showing that a defendant had seen the confiscation of a passport was evidence that supported a finding of guilt.  Id. at 560–61 ("The victim testified that Ngozi watched as Emmanuel confiscated the passport she used

United States District Court
Central District of California

United States District Court
Central District of California

The SAC alleges that the other Defendants knowingly benefitted from this violation. (Doc. No. 46 at 11; SAC at ¶120 ("All Defendants either perpetrated the described acts or knowingly and financially benefitted from them.").) Defendants argue, however, that Plaintiff's allegations are not sufficient to plead that the Defendants "knowingly benefitted" from the alleged confiscation of Plaintiff's passport. (Doc. No. 50 at 7.) The Court disagrees.

Here, Plaintiff has alleged that Sin "masterminded the scheme" to traffic Socheat and extract cheap labor from her, and that this scheme was premised, in part, on the confiscation of Plaintiff's documents. (SAC ¶7 ("Defendant Sin masterminded the scheme to traffic Socheat into the United States for force labor, including by . . . confiscating her documents . . . .").) Plaintiff has also included detailed allegations about how the other Defendants knowingly participated in this scheme. (See, e.g., SAC, ¶¶8-20; 106.) The allegations of the Defendants' participation in this scheme support the inference that they had knowledge of the rest of the scheme, including the confiscation of Plaintiff's identify documents. Moreover, the Complaint includes factual allegations that further support the inference that the Defendants other than Sin had knowledge of the confiscation of Plaintiff's passport. For example, Plaintiff has alleged that her passport was physically taken from her "[a]t Defendant Ngo's residence" and that later Plaintiff "told Defendant Yam that she could not leave because [Sin] had taken all of her identity documents." (SAC, ¶45, 62.) Plaintiff has also alleged that each Defendant

---

to enter the United States and that the victim did not again see the passport. . . . the jury could have inferred that Ngozi continued to conceal and possess the passport after the effective date to prevent the victim from leaving their home.") This case does not address the pleading standards for 18 U.S.C. § 1595.

benefitted from this scheme by forcing Plaintiff to work without properly compensating her.  (See, e.g., SAC, ¶¶7-20, 117, 120, 244.)

Construing the SAC in the light most favorable to Plaintiff, the Court finds it plausible that given allegations of Defendants' active participation in a scheme that involved the confiscation of Plaintiff's passport and identifying documents, that Defendants knew of the 18 U.S.C. § 1592 violation.  Additionally, Plaintiff has sufficiently alleged that Defendants benefitted from this scheme by obtaining Plaintiff's forced labor without proper compensation.  Accordingly, Plaintiff has alleged facts sufficient to state a claim against Defendants for violation of 18 U.S.C. § 1592 and § 1595(a).

## B.  Plaintiff's Claim for False Imprisonment – Claim 17

Plaintiff asserts a False Imprisonment Claim against all Defendants except Chan.  (SAC at ¶¶191-204.)  Defendants seek dismissal of this claim on the grounds that it is barred by the statute of limitations.  (Doc. No. 45-1 at 13.)  Plaintiff does not dispute that Cal. Code Civ. P. §340(c) sets a one-year statute of limitations for claims of false imprisonment that accrues upon termination of the imprisonment.  It is also undisputed that Plaintiff filed her original complaint on June 9, 2017, one year, eight months, and twelve days after Plaintiff alleged that law enforcement rescued Plaintiff from Defendants on September 28, 2015.  (SAC at ¶83; Doc. No. 45-2 at 4.)  Plaintiff argues that the doctrine of equitable tolling precludes dismissal.  (Doc. No. 46 at 13-16.)

United States District Court
Central District of California

Although it is more appropriate for a court to determine the applicability of equitable tolling "at the summary judgment or trial stage of litigation," the Ninth Circuit has upheld dismissals in "unusual cases" where "some fact, evident from the face of the complaint, supported the conclusion that the plaintiff could not prevail, as a matter of law, on the equitable tolling issue." Cervantes v. City of San Diego, 5 F.3d 1273, 1276 (9th Cir. 1993). The Ninth Circuit has held that "[t]he sole issue" governing such dismissals "is whether the complaint, liberally construed in light of our 'notice pleading' system, adequately alleges facts showing the *potential* applicability of the equitable tolling doctrine." Id. at 1277 (emphasis in original).

The Ninth Circuit has held that "[e]quitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond the plaintiff's control made it impossible to file a claim on time." Stoll v. Runyon, 165 F.3d 1238, 1242-43 (9th Cir. 1999), as amended (Mar. 22, 1999) (reversing the district court's dismissal because Plaintiff's allegations of psychiatric impairment as a result of the abuse by the defendants was "more than sufficient to toll the statute of limitations as a matter of law."). "[T]he Stoll court expressly set no minimum threshold of psychiatric disability that a plaintiff must labor under before tolling becomes appropriate, but instead indicated that tolling is applicable whenever a claimant is prevented from asserting a timely claim by a defendant's wrongful conduct or by extraordinary circumstances beyond the claimant's control." Equal Employment Opportunity Comm'n v. Willamette Tree Wholesale, Inc., No. CV 09-690-PK, 2011 WL 886402, at *8 (D. Or. Mar. 14, 2011).

Here, Plaintiff has alleged that she was subject to serious and sustained physical and emotional abuse at the hands of her captors, Defendants, for at least twenty-two months.

United States District Court
Central District of California

(See generally, SAC.)  The SAC alleges, for example, that Defendants threatened Plaintiff with violence against her or her family if she were to try to escape.  (See, e.g., SAC, ¶99.)  Defendants demonstrated their willingness to follow through on these threats in different ways, including one instance where Sin allegedly stabbed Plaintiff in the face with a knife.  (See, e.g., SAC, ¶65.)  Plaintiff has alleged that Defendants' wrongful conduct caused her severe mental distress and even drove her to attempt suicide shortly before her rescue.  (SAC, ¶¶78-81; SAC, ¶80 ("After her suicide attempt, [Plaintiff felt sick all the time. . . . She felt crazy all the time, like she might start screaming, and like she did not have control of her body.  Sometimes [Plaintiff] felt like she was trapped inside a tiny dark box and could not escape, even though she was screaming for help.")  Plaintiff has alleged that Defendant's purported abuse caused her psychological damage that has continued even after her rescue.  (SAC, ¶84 ("Since being rescued, [Plaintiff] lives in a shelter for trafficking survivors.  [Plaintiff] has been diagnosed with post-traumatic stress disorder ('PTSD'), and suffers from regular nightmares and troubled sleep.").)  These allegations support the reasonable inference that it was the extraordinary circumstances and Defendant's wrongful conduct that prevented Plaintiff from filing suit within the one-year statute of limitations.  Plaintiff therefore has alleged sufficient facts to show the potential applicability of the equitable tolling doctrine.

Defendant's argument that "[Plaintiff] should not be permitted to escape the bar of her alleged false imprisonment claim" lacks merit.  (Doc. No. 50 at 11.)  Defendant argues that since Plaintiff took certain affirmative steps to secure her rescue, "she was physically and mentally able upon being rescued to timely file a claim for false imprisonment."  (Doc. No. 50 at 9.)  The SAC belies this contention.  The allegations in the two paragraphs cited by Defendants allow the Court to draw the following inferences: (1) Plaintiff was so terrified of Defendants that she was reluctant to even approach a friendly police officer who

frequented the place where she was held captive; (2) Plaintiff's English skills were so poor she needed help from others to write a note asking for help; (3) Plaintiff was so terrified of reprisal by Defendants that she "never asked any person for more than one or two words" to use in her note requesting help; (4) it took Plaintiff two weeks to finish writing a simple plea for help given her lack of English proficiency and fear of Defendants; (5) Plaintiff had to secretly obtain a telephone because Defendants restricted Plaintiff's access to communication with others; and (6) it took at least a month to secure Plaintiff's rescue even after she first contacted law enforcement.  (See SAC at ¶¶82-83.)  It is also notable that it took Plaintiff a year to work up the courage to contact law enforcement after she decided to try to escape.  (SAC at ¶¶78, 81-83.)

In sum, these allegations do not "support the conclusion that [Plaintiff] could not prevail, as a matter of law, on the equitable tolling issue."  Cervantes, 5 F.3d at 1276.  To the contrary, they support the inference that Defendants caused psychological damage to Plaintiff that directly affected her already-limited ability to communicate with others.  The allegations in the SAC support the inference that Plaintiff's inability to communicate with well-meaning people trying to assist her caused a significant delay in coordinating even simple tasks, such as passing a note or placing a telephone call.  These allegations indicate that the equitable tolling doctrine potentially applies.  The Court therefore DENIES Defendants' motion to dismiss Plaintiff's Seventeenth Claim for False Imprisonment.

## C. Plaintiff's Claim of Negligent Infliction of Emotional Distress – Claim 22

Plaintiff asserts a claim for Negligent Infliction of Emotional Distress ("NIED") against all Defendants.  (SAC at ¶¶215-218.)  Defendants move to dismiss this claim

on the grounds that California law does not recognize an independent tort for NIED. (Doc. No. 45-1 at 14.)  Defendants are correct.  Wong v. Tai Jing, 189 Cal. App. 4th 1354, 1377 (2010) ("A claim of negligent infliction of emotional distress is not an independent tort but the tort of negligence to which the traditional elements of duty, breach of duty, causation, and damages apply.");  Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 984 (1993) ("[T]here is no duty to avoid negligently causing emotional distress to another, and . . . damages for emotional distress are recoverable only if the defendant has breached some other duty to the plaintiff."). While Plaintiff is entitled to plead separate claims for negligence, it is appropriate for the Court to dismiss NIED claims that are duplicative of negligence claims.  See, e.g., SoftScript, Inc. v. Edelstein, No. CV 08-0036 DSF (VBKx), 2008 WL 11334473, at *10 (C.D. Cal. Oct. 27, 2008) (dismissing NIED claim as duplicative of negligence claim based on the same alleged duty); Hernandez v. City of Richmond, No. 14-CV-03079-JST, 2014 WL 5034756, at *4–5 (N.D. Cal. Oct. 8, 2014) (dismissing "NIED claim [that] does not accuse Defendant of any wrongdoing beyond that alleged in support of the ninth cause of action for negligence."); Summers v. Delta Airlines, Inc., 805 F. Supp. 2d 874, 887 (N.D. Cal. 2011) (dismissing NIED claim that was "no more than a restatement" of plaintiff's negligence claim, but recognizing that plaintiff could recover damages for emotional distress as part of her negligence claim).

   Defendants argue that Plaintiff has not pled "additional particularized facts" to support an NIED claim distinct from her negligence claim.  (Doc.No. 50 at 12.)  The Court agrees.

In opposition, Plaintiff highlights numerous allegations in the SAC regarding non-physical acts in breach of duties that the Defendants owed Plaintiff. (Doc. No. 46 at 17-18.) While the Court agrees that these allegations may support liability for emotional distress damages, it is unclear how these allegations are distinct from those that underlie Plaintiff's negligence claim. Both claims are premised on the same duty and assert the same breaches of said duty. (Compare SAC, ¶¶206-208, and SAC, ¶216.)

The Court GRANTS Defendants' Motion to Dismiss Plaintiff's claim for NIED, with leave to amend.

### D. PLAINTIFF'S CLAIM OF VIOLATION OF THE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT – CLAIM 29.

Plaintiff asserts a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962, against Defendants Valero Gas Station, Arco Gas Station, Speedy Wash, Ngo Asset Management, Sin, Lim, Ngo, and Ngo in her capacity as trustee of the Tiffany Ngo Living Trust UTD ("RICO Defendants"). (SAC, ¶¶272-88.) Defendants contend Plaintiff does not allege sufficient facts to establish the required elements of a RICO claim. (Doc. No. 45-1 at 15-21.) To state a RICO claim, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" Living Designs, Inc. v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th Cir. 2005) (citing Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996); 18 U.S.C. §§ 1964(c), 1962(c); see also In re Toyota Motor Corp., 785 F. Supp. 2d 883, 918 (C.D. Cal. 2011).

United States District Court
Central District of California

### 1. Plaintiff Has Alleged Two or More Predicate Acts.

Liability under RICO "requires at least two separate racketeering acts (often called 'predicate acts')." United States v. Walgren, 885 F.2d 1417, 1424 (9th Cir. 1989); 18 U.S.C. § 1961(5). RICO defines "racketeering activity" to include a number of specific offenses listed in 18 U.S.C. § 1961(1).

Defendants argue that Plaintiff's allegations constitute "a single action of Defendants' alleged forced labor upon [Plaintiff]" and thus Plaintiff's RICO claim should be dismissed for failing to allege two or more predicate acts. (Doc. No. 45-1 at 17.) The Court disagrees with Defendants' characterization of the alleged predicate acts.

In Walgren, the petitioner sought to vacate his criminal RICO conviction, on the basis that there was only one predicate act. 885 F.2d at 1424-26. The Ninth Circuit agreed, holding that although the government had alleged the violation of two distinct statutes, these statutory violations were based entirely on one telephone conversation. Id. at 1426 ("Walgren . . . committed a single act (a telephone conversation) that coincidentally violated both a state and federal law.") For the purpose of determining the RICO predicate act, the Ninth Circuit held the petitioner's RICO conviction could not "be based solely upon this single act, even though he had violated two separate laws" by having this telephone conversation. Id.

Similar to Walgren, Plaintiff has alleged the violation of multiple statutes. (SAC, ¶¶ 281-83.) Unlike Walgren, where the statutory violations were based on a

single telephone call, Plaintiff's allegations constitute an array of distinct actions taken by multiple people over the course of twenty-two months.  The SAC identifies the predicate acts underlying Plaintiff's RICO claim to be violations of several statutes: 18 U.S.C. § 1584 (involuntary servitude), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude or forced labor), and 18 U.S.C. § 1592 (unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude or forced labor). (SAC, ¶¶ 281-83.)  The Court previously has held that such allegations for violations of these statutes constitute separate predicate acts sufficient to support a RICO claim.  Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd., 790 F. Supp. 2d 1134, 1148 (C.D. Cal. 2011) (where the plaintiff had alleged predicate acts for violations of 18 USC § 1589 and § 1592(a),  the plaintiffs' "forced labor allegations alone [were] enough to support their RICO claim"); see also, Aragon v. Che Ku, No. 16-CV-3907 (WMW/KMM), 2017 WL 4325601, at *12 (D. Minn. Sept. 28, 2017) (allegations of "multiple violations of the TVPRA against multiple people on numerous occasions" constituted predicate acts under RICO).

The Court finds that Plaintiff's allegations are sufficient to establish two or more predicate acts for purposes of stating a RICO claim.

### 2. Plaintiff Has Alleged Continuity Between the Alleged Predicate Acts.

In order to show a pattern under RICO, a plaintiff must demonstrate that the alleged predicate acts were both related and continuous.

United States District Court
Central District of California

To be "related," the United States Supreme Court has held that the conduct at issue "forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240, (1989); Harmoni Int'l Spice, Inc. v. Wenxuan Bai, No. CV 16-00614 BRO (ASx), 2016 WL 9275400, at *16 (C.D. Cal. Nov. 14, 2016) (finding the "relatedness" requirement satisfied where the predicate acts had "similar purposes, results, and victims.").

In turn, "to satisfy the continuity requirement, [a complainant] must prove either a series of related predicates extending over a substantial period of time, i.e., closed-ended continuity, or past conduct that by its nature projects into the future with a threat of repetition, i.e., open-ended continuity." Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Local 996, 302 F.3d 998, 1011 (9th Cir. 2002). The Ninth Circuit has declined to set a bright line rule regarding the definition of a "substantial period of time" necessary to establish closed-ended continuity, but has found that allegations spanning thirteen months can satisfy continuity. Allwaste, Inc. v. Hecht, 65 F.3d 1523, 1528 (9th Cir. 1995) ("[A] showing [that the predicate acts occurred over thirteen months] would have demonstrated that the criminal activity spanned a "substantial period of time" and, therefore would have satisfied the continuity requirement.").

The Court finds that the alleged predicate actions were both related and continuous. Rather than being "isolated or sporadic" acts, the alleged predicate acts embraced a single scheme. Defendants allegedly employed physical abuse, emotional abuse, threats against Plaintiff, threats against Plaintiff's family, and

confiscation of Plaintiff's identifying documents to traffic Plaintiff to the United States, force Plaintiff to provide labor to benefit Defendants, and to prevent Plaintiff from escaping or contacting law enforcement.  Since these alleged predicate acts involved the same victim, had the same purpose, and had similar results, the relatedness requirement is satisfied here.

The Court also finds that the acts occurred over a substantial period of time for purposes of determining close-ended continuity.  Plaintiff alleges that the RICO Defendants' scheme spanned approximately twenty-two months, with an interim period of six months where she was under the control of other named Defendants.  Plaintiff alleged that on June 11, 2013, her first day in the United States, Plaintiff's passport was confiscated and she was forced to promise not to run away.  (SAC at ¶¶45-46.)[2]  Plaintiff alleged that she was forced to work for the RICO Defendants or other named Defendants without adequate pay and benefits until September 28, 2015 when she was rescued by law enforcement.  (SAC at ¶¶48-83.)  For approximately sixteen of the twenty-two months, the RICO Defendants are alleged

---

[2] This is a conservative estimate of the time the RICO Defendants' racketeering activity began, since Plaintiff has alleged that Defendants first took steps to arrange for Plaintiff to come to the United States and work for Defendants as early as July 2009. (SAC at ¶¶21-24.)  The Ninth Circuit has held that there is a presumption against extraterritorial application of RICO.  United States v. Chao Fan Xu, 706 F.3d 965, 974-79 (9th Cir. 2013) (considering whether the focus of the racketeering enterprise was substantially in the United States since there is "a presumption that RICO does not apply extraterritorially in a civil or criminal context.");  see also United States v. Philip Morris USA, Inc., 783 F. Supp. 2d 23, 29 (D.D.C. 2011) ("[T]here is no evidence that Congress intended to criminalize foreign racketeering activities under RICO.");  Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 33 (2d Cir. 2010) ("The slim contacts with the United States alleged by Norex are insufficient to support extraterritorial application of the RICO statute.").  It is not necessary for the Court to determine whether Defendants' actions before Plaintiff's arrival in the United States constituted an extraterritorial application of RICO.

to have continuously abused, threatened, and otherwise coerced Plaintiff to work for their benefit and to prevent Plaintiff from escaping or notifying law enforcement.

Plaintiff's allegations are sufficient to establish closed-ended continuity.  It is not necessary, therefore, for the Court to address whether Plaintiff has established open-ended continuity.

### 3. A RICO Claim May be Brought by a Single Victim.

Defendants argue that Plaintiff's failure to allege a RICO scheme involving "multiple victims" justifies dismissal of Plaintiff's RICO claim.  The Court disagrees.  The Ninth Circuit has held that a RICO claim may be brought by a single victim.  Kearney v. Foley & Lardner, LLP, 607 F. App'x 757, 759 (9th Cir. 2015)) (reversing the dismissal of a RICO claim brought by a single victim who had "alleged she was harmed multiple times through multiple predicate acts" because "a pattern does not require multiple victims."); see also Martinez v. Calimlim, 651 F. Supp. 2d 852, 856 (E.D. Wis. 2009) (denying motion to dismiss single trafficking victim's RICO claim).

### 4. Plaintiff Has Alleged a Conspiracy to Violate 18 U.S.C. §1962(c).

Defendants assert that Plaintiff has not alleged a conspiracy under 18 U.S.C. §1962(d) to violate 18 U.S.C. §1962(c).  (Doc. No. 45-1 at 21.)  "[A] RICO conspiracy under § 1962(d) requires only that the defendant was aware of the essential nature and scope of the enterprise and intended to participate in it.  United States v. Christensen, 828 F.3d 763, 780 (9th Cir. 2015), cert. denied, 137 S. Ct. 628,

(2017), and cert. denied sub nom. Kachikan v. United States, 137 S. Ct. 2109 (2017). "Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." Howard v. Am. Online Inc., 208 F.3d 741, 751 (9th Cir. 2000).

As discussed above, Plaintiff has alleged that the RICO Defendants participated in the violation of at least two predicate acts in furtherance of the scheme to subject Plaintiff to forced labor without proper compensation. Given the allegations regarding the RICO Defendants' continued participation in this scheme, it is also reasonable to infer an agreement between the RICO Defendants to commit these predicate acts. The Court finds that Plaintiff has adequately alleged a conspiracy under 18 U.S.C. §1962(d).

For the reasons discussed above, the Court DENIES Defendants' Motion to dismiss Plaintiff's Twenty-Ninth Claim for Relief.

//
//
//
//
//
//
//
//
//
//
//
//

United States District Court
Central District of California

## IV.   CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendants' Motion.  The Court DISMISSES Plaintiff's claim for NIED with leave to amend.  The remainder of Defendant's Motion is DENIED.  Any amended pleading must be filed no later than November 27, 2017.

**IT IS SO ORDERED.**

Dated:    11/7/17

Virginia A. Phillips
Chief United States District Judge

United States District Court
Central District of California